Clinton Eugene BYRD *v.* STATE of Arkansas

CR 98-1087

992 S.W.2d 759

Supreme Court of Arkansas
Opinion delivered May 6, 1999

[Substituted opinion delivered June 10, 1999]

414

*Val P. Price*, for appellant.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Ass't Att'y Gen., for appellee.

RAY THORNTON, Justice. Appellant Clinton Eugene Byrd appeals the judgment of the Craighead County Circuit Court finding him guilty of first-degree murder for the June 7, 1997, death of Austin Davis, the seven-month-old son of appellant's girlfriend. Appellant was tried by a jury and sentenced to life imprisonment, which gives rise to our jurisdiction to review this matter under Ark. Sup. Ct. R. 1-2(a)(2). Appellant raises four arguments for reversal: (1) That there was insufficient evidence that he knowingly caused the child's death; (2) that the trial court improperly sustained an objection to appellant's attempt to impeach a witness based upon a prior inconsistent statement; (3) that the trial court erred when it refused to rule on an objection to the State's cross-examination of appellant; and (4) that it was error for the trial court to deny appellant's request for an instruction on a lesser charge of second-degree murder. We find no reversible error and affirm the trial court's judgment.

## I.  Facts

Appellant lived in Jonesboro with his girlfriend, Danna Davis, and her seven-month-old twin sons, Blake and Austin Davis.  On the evening of June 5, 1997, Danna Davis left her sons with appellant while she went to work, leaving the home at approximately 6:00 p.m. She later described the physical condition of the children as "fine," with no bruises or abnormalities, before she went to work.  At approximately eight o'clock that evening, appellant ran to the emergency room of St. Bernard's Hospital, carrying the crumpled body of Austin.

Dr. Brian Harvey, a pediatrician at St. Bernard's, testified that Austin was pale and very ill, with two long linear bruises above his left eyebrow and abnormal breathing and heart rates. The child's body temperature was very low, and he was in a coma-like state.  Dr. Harvey testified that appellant told him that he had left Austin in the bathtub to check on his twin brother and returned to find the child unresponsive, but not under water. Appellant told the doctor that in trying to revive the child, "I hit him hard, doc.  I hit him real hard and after that he quit moving." Appellant told the doctor that he slapped him "real hard" on the face and head to get him to breathe, and when he did not respond, ran with him to the emergency room.  Dr. Harvey testified that his tentative diagnosis, based on the facial bruising, rib fractures, inner cranial bleeding, and loss of consciousness that his examination revealed, was child abuse, and that his injuries were inconsistent with appellant's description of the events.  Austin was airlifted to Arkansas Children's Hospital (hereinafter "Children's") in Little Rock, where he was placed on life support for his extensive internal injuries.

Dr. Amanda Bradshaw, a resident at Children's, testified that Austin was placed on a ventilator.  She attempted to take a history on the incident from appellant and Danna Davis and reported that appellant did not say anything about hitting the child at that time, but did claim that the child was sitting up in the bathtub when he returned. Dr. Sara Cline, a radiologist at Children's, testified that the X-rays, bone scans, and CT scans taken of Austin revealed five healed or healing fractures, including a skull fracture and a left

tibia fracture, as well as five broken ribs, all of which were more than twenty-four hours old. Austin's brain scan revealed a skull fracture with soft tissue swelling of the scalp, indicating a recent fracture, and that all parts of the brain were swollen, with the sutures spread apart. Blood had filled the open spaces of the child's brain.

Austin's left leg indicated a "bucket handle fracture," found only in children younger than two years of age due to the softness of their bones. According to Dr. Cline, this type of fracture occurs only as a result of child abuse, not from typical childhood accidents, and generally from shaking the child by the limb. Furthermore, the brain injuries found in Austin were consistent with banging the child's head against a solid object. A characteristic of child abuse is the presence of injuries of various ages, indicating more than one episode of violent abuse. Austin's injuries suggested healing rib fractures of two to six weeks old, a leg fracture of less than a week, and an acute brain and skull injury, suggesting at least two episodes of abuse. The cause of death was severe shaking leading to head injury, and this degree of shaking was not consistent with appellant's description of attempting to resuscitate the child. The radiology studies of the head injury indicated that the injury would have occurred between six and eight p.m. on the evening of June 5, 1997, and it would be unlikely that the injury occurred much before six o'clock because of the seriousness of the condition. Dr. Cline testified that she was "one hundred percent sure" that Austin was abused, based on the nature and pattern of injuries that she observed, and that it was such a classic case of child abuse that she used Austin's X-rays as illustrative in teaching classes.

Dr. Mark Heulitt from the intensive care unit of Children's testified concerning Austin's brain injury and swelling, describing bleeding and brain damage indicating brain death. According to Dr. Heulitt, the brain swelling was a complication from the brain injury. In meeting with appellant and Danna, Dr. Heulitt reported that appellant described a fall by Austin that could not be corroborated by his mother, as well as hitting his head on a car door on the way to the hospital. According to Dr. Heulitt, none of the explanations offered by appellant were consistent with Aus-

tin's level of injuries. The doctor's diagnosis was child maltreatment syndrome or shaken baby syndrome, and testified that he was "one hundred percent certain" that this was child abuse, and that the brain injury occurred within an hour of his arrival at the emergency room in Jonesboro, which was around 8:00 p.m. There was no indication that Austin's death was a result of past breathing problems or seizure disorder.

Austin was determined to be brain dead and he was taken off life support on June 7, 1997. An autopsy was performed by the State Crime Lab, and Dr. Charles Kokes, medical examiner, testified about their findings. In Dr. Kokes's opinion, Austin died as a result of cranial cerebral injuries, or blunt force trauma to the head and brain. His medical opinion was that the manner of death was homicide.

At the close of the State's case, appellant, who was charged with first-degree murder under Ark. Code Ann. § 5-10-103(a)(3) with "knowingly causing death of a person fourteen years of age or younger," moved for a directed verdict, arguing that the State had failed to prove the element of "knowingly." The motion was denied. Appellant then took the stand in his own defense, alleging that Danna had thrown or kicked Austin on the floor before she left for work. According to appellant, he found Austin had a dirty diaper and put him in the bathtub with the water running, leaving him unattended momentarily to check on Blake, and returned to find Austin under water. He admitted slapping Austin "pretty hard" and shaking him repeatedly, attempting to get some response from the child. He denied causing any of the injuries described by the doctors, except for the brain injuries. Appellant testified that, "I didn't cause any injuries to the child except for the swelling of the brain which the doctor in Little Rock told us that was due to shaking. That would be the only injury that I caused." Appellant testified that he was the primary care giver for the children and that he knew that he had to be careful with the children because they were "soft." He further testified that the child was too young to crawl and had only just begun sitting up on his own.

Appellant's testimony concluded the defense and appellant again moved for a directed verdict on the grounds that the State had failed to prove the element of "knowingly." The motion was again denied, and the court took up the issue of jury instructions. The defendant requested that the jury be instructed on the charge of second-degree murder, arguing that this was a lesser included offense of the first-degree murder charge. The trial court denied the request, ruling that second-degree murder could not be a lesser included offense of the murder charge because the second-degree murder charge contained an additional element not present in the first-degree murder charge, i.e. causing the death under circumstances manifesting extreme indifference to the value of human life.

The jury returned a verdict of guilty, and, following a sentencing hearing with victim-impact evidence, recommended a sentence of life imprisonment. Appellant was sentenced to life by the trial judge, and this appeal follows.

## II. Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence to support his conviction for first-degree murder. When an appellant challenges the sufficiency of the evidence, we address the issue prior to all others. *Roseby v. State*, 329 Ark. 554, 953 S.W.2d 32 (1997). On appeal, appellant claims that his conviction must be reversed because the State failed to present sufficient evidence that he acted "knowingly" in causing the death of Austin Davis, as required by Ark. Code Ann. § 5-10-102(a)(3)(Repl. 1997), which provides that a person commits murder in the first degree if he knowingly causes the death of a person fourteen (14) years of age or younger at the time the murder was committed.

■ ■ A motion for directed verdict is a challenge to the sufficiency of the evidence. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. Substantial evidence is evidence that is of sufficient certainty and precision to compel a conclusion one way or another. *Ladwig v. State*, 328 Ark. 241, 943 S.W.2d 571 (1997). In a challenge to the sufficiency of the

evidence, the appellate court reviews the evidence in the light most favorable to the State, and sustains a judgment of conviction if there is substantial evidence to support it. *Abdullah v. State*, 301 Ark. 235, 783 S.W.2d 58 (1990).

In his argument, appellant offers various purportedly exculpatory facts to be weighed against evidence presented at trial by the State. This court, however, views only the evidence that is most favorable to the jury's verdict and does not weigh it against other conflicting proof favorable to the accused. *Hendrickson v. State*, 316 Ark. 182, 871 S.W.2d 362 (1994). A criminal defendant's intent or state of mind is rarely capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997).

Here, the evidence was sufficient to establish that appellant "struck and shook the child knowing that the result could be serious injury [or] death." *Ladwig, supra.* The medical testimony of the physicians who treated Austin presented uncontroverted evidence of child maltreatment, particularly from descriptions of blunt force trauma causing a skull fracture and brain swelling and hemorrhage leading to the child's death. The radiological studies indicated that the life-threatening injuries occurred between six and eight p.m., during the time in which appellant was the only care giver of the child, and the intensive care physician testified that he was "one hundred percent certain" that the brain injury occurred within an hour of Austin's arrival at the Jonesboro hospital.

According to Ark. Code Ann. § 5-2-202 (Repl. 1993), "A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result." *Ladwig v. State*, 328 Ark. 241, 943 S.W.2d 571 (1997). A jury need not lay aside its commonsense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *See e.g., Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997); *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996). The evidence was sufficient to show that appellant struck and shook the child know-

ing that the result could be serious injury or death. The motion for directed verdict was properly denied.

### III.  Impeachment with Prior Inconsistent Statement

For his second point on appeal, appellant contends that the trial court improperly sustained an objection by the State to appellant's attempt to impeach Danna Davis's testimony based on a prior inconsistent statement to the police. The exchange was as follows:

Q.  Going back to the . . . statement [you made to the Jonesboro police], and this would have been on June 9th, I believe that was a — Was that a taped statement?

A.  Yes, sir.

Q.  Have you ever seen Clinton strike Blake?  ·

A.  Blake, no.

Q.  Have you ever seen Clinton strike Austin?

A.  No.

Q.  Have you ever seen Clinton physically abuse Austin?

A.  No — Yeah — I mean, I told him about a time when he walked into the bedroom when they were crying, and he had went in there and Clinton had locked the door behind him, and I had to get a credit card to open it, and he was like had Austin holding his mouth, holding his face like trying to get him to quit crying or pass out or something, and I tried to get him away from him, and he pushed me away, and I asked him what he was doing, you what, "What are you doing," and that's the only time —

Q.  Do you recall being asked a question — This is on page four — did you ever see Clinton physically abuse Austin or Blake, and you answered: I never saw him. Do you recall giving that answer?

A.  Yeah, I guess. I don't remember.

The State objected to this line of questioning, arguing to the trial court that the defense could not ask questions on cross for purposes of bringing out contradictions for purposes of impeach-

ment. The trial court sustained the objection, and appellant was not permitted to further attempt to impeach the witness with her alleged inconsistent statement. Appellant argues on appeal to this court that the case should be reversed and remanded on this point.

While we agree with appellant that the trial court's ruling reflected an incorrect understanding of the Rules of Evidence with regard to impeachment with a prior inconsistent statement, we do not find this to be reversible error because appellant does not show prejudice. The witness was asked whether she had made a previous contradictory statement and answered that she had made such a statement. Although appellant did not make a proffer of the testimony that he hoped to elicit from the witness, we note that Rule 613 of the Arkansas Rules of Evidence permits extrinsic evidence of prior inconsistent statements of a witness to be introduced for the purpose of impeachment only if the witness is afforded the opportunity to explain or deny the statement, and *does not admit having made it*, and the other party is afforded the opportunity to interrogate the witness on that statement. *See Chisum v. State*, 273 Ark. 1, 616 S.W.2d 728 (1981); *Harris v. State*, 36 Ark. App. 120, 819 S.W.2d 30 (1991). If the witness, however, admits making the prior inconsistent statement, then extrinsic evidence of that statement is not admissible. Also, unsworn prior statements made by a witness cannot be introduced as substantive evidence in a criminal case to prove the truth of the matter asserted therein. Ark. R. Evid. 801(d)(1)(i); *Smith v. State*, 279 Ark. 68, 648 S.W.2d 490 (1983).

Under the circumstances of this case, appellant has demonstrated no prejudice as a result of the granting of the State's objection, as the proof of his guilt is overwhelming. Even assuming the trial court erred in sustaining the State's objection, the error was harmless in that the prejudicial effect of the testimony was minimal and the evidence of guilt was overwhelming. *Rockett v. State*, 318 Ark. 831, 890 S.W.2d 235 (1994). We cannot say that this claim of error warrants reversal.

### III.  *Trial Court's Refusal to Rule on Appellant's Objection*

Appellant next contends that the trial court committed error when it failed to rule on appellant's objection during the following exchange between the prosecutor and appellant.

> Q.  The doctors from Children's also in Little Rock indicate that when you got down there you told them you hit this kid's head on the car.
>
> A.  I said that I did not know.  He asked what the possibilities were of what would have caused this child's damages, and I told him that I did not know because he asked if I had hit his head.  I told him I didn't know if I had hit his head or not, and that's what led to the conclusion did I hit it on the way out the door, did I hit it getting in the car.  And I didn't answer this question myself.  I didn't say yes, I did, or no, I didn't.
>
> Q.  So, Doctor Heulitt gave the wrong testimony today, is that what you're saying?
>
> A.  I am not sure what I . . .
>
> Q.  Doctor Heulitt said you told him you hit this kid's head against the car . . .

Appellant's attorney objected to the form of the question, asserting that this was an improper characterization of the testimony given by Dr. Heulitt.

The judge responded that the jury had made notes and could draw their own conclusions from the evidence presented, but he would not comment on the evidence.  Appellant's counsel then restated his objection and asked the court for a ruling, which the trial judge again refused to give, saying that to rule on the objection as appellant had phrased it would be equivalent to commenting on the evidence.  At a bench conference, the judge stated: "[I]f I sustain the objection, I am saying that the doctor didn't say that, and that's a comment on the evidence because I don't know for sure what he said exactly . . . Maybe you ought to rephrase your objection to one that is a proper objection that I can rule on.  That particular objection is not a proper objection . . . It sounds to

me like what you are leading up to is an argumentative question of who is telling the truth, which is an argumentative question."

■ Appellant contends in his brief that his objection was a proper objection to the form of the question because the question assumed a fact not in evidence, and asks that this court reverse the trial court and remand the case based on this point. We decline to do so. Appellant's argument must fail because he failed to obtain a ruling on his objection. This court will not review a matter on which the trial court did not rule, and a party seeking to raise the point on appeal concerning a ruling has the burden to obtain a ruling. Matters left unresolved simply may not be raised on appeal. *Alexander v. State*, 335 Ark. 131, 983 S.W.2d (1998). While appellant understood the necessity of getting a ruling, and repeatedly asked the court to give one, he did not state his objection in a form on which the trial judge believed he could rule without commenting on the evidence.

■ ■ Furthermore, a party cannot complain about a favorable ruling on appeal, as appellant now seeks to do. *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied* 520 U.S. 1244 (1997). At the conclusion of the bench conference on this issue, the trial court admonished the State not to ask argumentative questions, saying that it appeared to the court that the State was attempting to ask a question about "who is telling the truth." The trial court's admonition amounted to a ruling in appellant's favor, as the State did not return to that line of questioning. Lastly, appellant has not shown any prejudice from the trial court's failure to grant his objection, and when the evidence of guilt is overwhelming and the error is slight, we can declare that the error was harmless and affirm. *Rockett v. State*, 318 Ark. 831, 890 S.W.2d 235 (1994).

*IV. Lesser Included Offense Instruction*

Appellant requested that the trial court instruct the jury on the lesser charge of murder in the second degree, Ark. Code Ann. § 5-10-103, contending that it was a lesser included offense of the original charge of murder in the first degree, for "knowingly caus[ing] the death of a person fourteen (14) years of age or

younger at the time the murder was committed." Ark. Code Ann. § 5-10-102(a)(3). Appellant contended that the trial court should have given the instruction applicable to second-degree murder that appellant "knowingly caused the death of Austin Davis under circumstances manifesting extreme indifference to the value of human life," as well as the appropriate transitional instruction, and instructed the jury to consider second-degree murder as an alternative to the crime charged as a lesser included offense. The flaw in this argument is that the element of causing a death under circumstances manifesting extreme indifference to the value of human life" is not an element of the charge for first-degree murder of a person aged fourteen years or younger.

██ ██ An offense must meet three criteria to be considered a lesser included offense: 1)It must be established by proof of the same or less than all the elements of the greater offense; 2) it must be of the same generic class as the greater offense; and 3) it must differ from the greater offense based upon degree of risk to persons or property or upon grades of intent or culpability. *Brown v. State,* 325 Ark. 504, 929 S.W.2d 146 (1996). A trial court does not err by refusing to give an instruction on an offense that is not a lesser included offense of the greater, charged offense, or "where the indictment for the greater offense does not contain allegations of all the ingredients of the lesser offense." *Id.* We will affirm a trial court's decision to exclude an instruction on a lesser included offense only if there is no rational basis for giving the instruction. *Spann v. State,* 328 Ark. 509, 944 S.W.2d 537 (1997).

As we noted in *Davis v. State, supra,* the Arkansas General Assembly has specifically addressed appellant's argument that the phrase "under circumstances manifesting extreme indifference to the value of human life" is not an additional element but merely a different way to prove "knowingly caused the death." A review of legislative history discloses that in response to our decision in *Midgett v. State,* 292 Ark. 278, 729 S.W.2d 410 (1987), the legislature amended the definition of first-degree murder to include knowingly caused the death of a person age fourteen or younger under circumstances manifesting cruel or malicious indifference to the value of human life. *See* Act 52 of the First Extraordinary Session of 1987. Then, in 1991, the legislature deleted the ele-

ment "under circumstances manifesting cruel and malicious indifference to the value of human life" from the first-degree murder statute. *Davis, supra.* The language formerly used to define first-degree murder, with a slight revision, was converted into a type of capital murder.

Here, the crime charged, first-degree murder, does not require proof of circumstances manifesting extreme indifference to the value of human life. A person acts "under circumstances manifesting extreme indifference to the value of human life" when he engages in deliberate conduct which culminates in the death of some person. *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996). The General Assembly has specifically stated that to prove first-degree murder, the State need only show that appellant knowingly caused the death of a person aged fourteen or younger. A person acts "knowingly" with respect to his conduct or attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exist. He acts "knowingly" with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result. Ark. Code Ann. § 5-2-202(2) (Repl. 1997).

The trial court's ruling was correct both because the proffered version of second-degree murder is not a lesser included offense of first-degree murder under Ark. Code Ann. § 5-10-102(a)(3), with which appellant was charged, and also because the information did not charge him with causing a death under circumstances manifesting extreme indifference to the value of human life. Second-degree murder pursuant to Ark. Code Ann. § 5-10-103(a)(1) cannot be a lesser included offense of first-degree murder under Ark. Code Ann. § 5-10-102(a)(3) because that second-degree murder charge requires a showing that one knowingly caused the death of another person under circumstances manifesting extreme indifference to the value of human life, an element in addition to the requirements of the statute under which appellant was charged.

While this may be an issue of first impression for this court, the analysis in *Brown v. State*, 325 Ark. 504, 929 S.W.2d 146 (1996) is instructive. In *Brown,* the appellant, who was

charged with capital murder and convicted of the lesser included offense of first-degree felony murder, appealed his conviction on the ground that it was error for the trial court to have refused to instruct the jury on the lesser included offense of second-degree murder. This court affirmed the conviction, holding that second-degree murder is not a lesser included offense of capital felony murder. We held that because second-degree murder requires proof of an element not required for proof of felony murder, second-degree murder is not a lesser included offense of felony murder. Furthermore, where the indictment for a greater offense does not contain allegations of all the ingredients of the lesser offense, a conviction of the lesser cannot be sustained, even though the evidence may supply the missing element. *Id.*

In the instant case, the information charged appellant with knowingly causing the death of Austin Davis, a person aged fourteen years or younger. The additional language of knowingly causing the death under circumstances manifesting extreme indifference to human life was not charged in the information, and was not required to be proven in order to sustain a conviction for first-degree murder. Because appellant was not so charged, there is no rational basis to justify charging the jury with the lesser offense of second-degree murder. The trial court is affirmed on this point as well.

## V. Rule 4-3(h) Review

In accordance with Rule 4-3(h), the record has been reviewed for adverse rulings to objections made by appellant but not raised on appeal, and no such errors have been found.

Affirmed.

BROWN, J., dissenting.

ROBERT L. BROWN, Justice, dissenting. The majority holds today that Byrd was not entitled to an instruction for second-degree murder because the instruction he offered contained the language "under circumstances manifesting extreme indifference to the value of human life." *See* Ark. Code Ann. § 5-10-103(a)(1) (Repl. 1997). According to the majority, the first-

degree murder provision under which Byrd was charged is for knowingly causing the death of a person age fourteen or younger. *See* Ark. Code Ann. § 5-10-102(a)(3) (Repl. 1997). Because this first-degree murder statute does not include the "extreme indifference" clause, the majority concludes the second-degree murder instruction could not be given.

The first fallacy in the majority's reasoning is that the first-degree murder subsection for purposeful murder also does not contain the "extreme indifference" clause. *See* Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997). Does this mean that the second-degree murder instruction with the "extreme indifference" language also cannot be used as a lesser included offense for purposeful first-degree murder? Surely not. In fact, we recently held that a jury was appropriately instructed with the second-degree murder offense containing the "extreme indifference" language as a lesser-included offense of purposeful first-degree murder. *See Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997). The Court of Appeals appears to have held similarly. *See Lanes v. State*, 53 Ark. App. 266, 922 S.W.2d 349 (1996). Now with today's decision, this second-degree murder instruction has been invalidated for both purposeful first-degree murder and knowingly killing a person age fourteen or younger. This unquestionably, was not the intent of the General Assembly, and our circuit courts will now, understandably, be in a quandary about what to do.

The second fallacy in the majority's reasoning is that it disregards the fact that the "extreme indifference" language relates to the perpetrator's degree of intent. The definition of "knowingly" in the Criminal Code makes the connection between "knowledge" and "circumstances" abundantly clear:

> (2) "KNOWINGLY." A person acts knowingly with respect to his conduct or the attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exist. A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result;

Ark. Code Ann. § 5-2-202(2) (Repl. 1997). The Original Commentary to the second-degree murder statute underscores the point:

> An actor "knowingly" causes a result when he engages in conduct with an awareness that "it is practically certain that his conduct will cause such a result." See § 5-2-202(2). The requirement of "knowledge" with regard to attendant circumstances manifesting extreme indifference is satisfied if the actor "is aware . . . that such circumstances exist." See, § 5-2-202(2).

Ark. Code Ann. ORIGINAL COMMENTARY, Vol. B, p. 169 (Repl. 1995).

The identical "extreme indifference" language is used in our first-degree battery statute. *See* Ark. Code Ann. § 5-13-201(a)(3) (Repl. 1997). We have held on two occasions that the "extreme indifference" clause for first-degree battery relates to proof of the intent or mental state of the accused. *See Tigue v. State*, 319 Ark. 147, 889 S.W.2d 760 (1994); *Martin v. State*, 261 Ark. 80, 547 S.W.2d 81 (1997). The commentary to the battery statutes emphasizes this point. Ark. Code Ann. COMMENTARIES, Vol. B, pp. 185-187 (Repl. 1995). Hence, for the majority to hold that the clause does not relate to intent flies in the face of prior precedent.

The majority illogically concludes that because the General Assembly eliminated the "extreme indifference" language from the first-degree murder statute for those age fourteen or younger, it intended to wipe out the second-degree instruction with comparable language. Why does that necessarily follow? I do not believe it does. Remember, at that same legislative session the General Assembly added the "extreme indifference" language as part of the capital-murder statute for murdering a person age fourteen or younger. *See* Ark. Code Ann. § 5-10-101(a)(9) (Repl. 1997) (Act 683 of 1991).

The majority also cites *Brown v. State*, 325 Ark. 504, 929 S.W.2d 146 (1996), to bolster its argument, but that case is clearly inapposite. In *Brown*, the defendant was charged with capital felony murder and convicted of first-degree felony murder. He asserted as error the failure of the trial court to instruct the jury on

the same second-degree murder instruction at issue in this case. We drew the obvious distinction between felony murder and intentional murder and held that the second-degree murder instruction offered related to intentional murder. Thus, it did not qualify as a lesser-included offense.

Again, I worry about the ramifications of what we do today. We abolish a second-degree murder instruction for a whole panoply of purposeful first-degree murder offenses. It is reversible error not to instruct on a lesser included offense when an instruction is warranted. *See Moore v. State*, 280 Ark. 222, 656 S.W.2d 698 (1983); *Brewer v. State*, 271 Ark. 254, 608 S.W.2d 363 (1980). I would hold, as we have in the past, that it was error not to give the second-degree murder instruction, and I would reverse and remand for a new trial.